# In the United States Court of Appeals For the Tenth Circuit

———————

ESTATE OF MARVIN L. BOOKER, ET AL.,

*Plaintiffs-Appellees,*

v.

FAUN GOMEZ, JAMES GRIMES, KYLE SHARP, KENNETH ROBINETTE, AND CARRIE RODRIGUEZ,

*Defendants-Appellants,*

and

CITY AND COUNTY OF DENVER, ET AL.,

*Defendants.*

———————

**On Appeal from the United States District Court For the District of Colorado, Denver**

———————

**BRIEF OF PLAINTIFFS-APPELLEES**

———————

Darold W. Killmer
Mari Newman
Lauren L. Fontana
Killmer, Lane & Newman, LLP
1543 Champa Street, Suite 400
Denver, CO 80202
(303) 571-1000
*Attorneys for Plaintiffs-Appellees*

**ORAL ARGUMENT IS REQUESTED**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................iv

STATEMENT OF RELATED CASES ....................................................1

JURISDCTIONAL STATEMENT .........................................................1

STATEMENT OF THE CASE................................................................1

STATEMENT OF FACTS .....................................................................3

SUMMARY OF THE ARGUMENT .....................................................5

ARGUMENT .........................................................................................6

I. The Record Contains a Myriad of Disputed Material Facts..............7

    A. The District Court's Denial of Summary Judgment Because
    Plaintiffs' Claims Are "Riddled With Fact Disputes" is
    not Appealable .............................................................................8

    B. The Video Does Not Resolve Material Fact Disputes .................9

    C. Defendants Were Unable to Quiet Plaintiffs' Asserted Fact Disputes ......12

    D. A Multitude of Material Facts Remain in Dispute .....................14

II. The District Court was not Required to Decide Between the Fourth
    and Fourteenth Amendments ..........................................................16

III. The District Court Properly Concluded that Defendants are not Entitled
    to Qualified Immunity on Plaintiffs' Excessive Force Claim .......19

    A. Disputed Facts Preclude a Determination that the use of Force Did
    not Violate Mr. Booker's Constitutional Rights.........................20

        1. Disputed Facts Preclude a Determination that Defendant Grimes's

Use of Force was Constitutional ...................................................21

2. Disputed Facts Preclude a Determination that Defendant
Rodriguez's Use of Force was Constitutional ......................................25

3. Disputed Facts Preclude a Determination that all Defendants'
Failures to Intervene Did not Violate Mr. Booker's Constitutional
Rights ...............................................................27

B. The Law Prohibiting Defendants' Use of Force was Clearly
Established ...............................................................30

1. The Law Prohibiting Defendant Grimes's Use of Force was
Clearly Established ...............................................................31

2. The Law Prohibiting Defendant Rodriguez's Use of Force was
Clearly Established ...............................................................35

3. Defendants' Duty to Intervene was Clearly Established ......................38

IV. The District Court Properly Concluded that Defendants are not
Entitled to Qualified Immunity on Plaintiffs' Failure to Provide Medical
Care Claim ...............................................................42

A. Disputed Facts Preclude a Determination that Defendants Did not
Violate Mr. Booker's Right to the Provision of Medical Care...................43

1. The Objective Component ...................................................44

2. The Subjective Component...................................................47

B. The Law Prohibiting Defendants' Conduct was Clearly
Established ...............................................................50

V. The District Court Properly Concluded that Defendant Rodriguez is not
Entitled to Qualified Immunity on Plaintiffs' Failure to Supervise
Claim ...............................................................52

A. Disputed Facts Preclude a Determination that Defendant Rodriguez's Supervisory Conduct was Constitutional ..................................................... 52

B. The Law Prohibiting Defendant Rodriguez's Supervisory Conduct was Clearly Established ................................................................. 55

VI. The District Court Properly Considered Defendants' Actions in Concert ...................................................................................... 56

CONCLUSION ................................................................................ 58

STATEMENT REGARDING ORAL ARGUMENT ........................................ 58

CERTIFICATE OF COMPLIANCE ................................................... 60

CERTIFICATE OF SERVICE ......................................................... 61

CERTIFICATE OF DIGITAL SUBMISSION ................................... 63

# TABLE OF AUTHORITIES

Page

CASES

*Allen v. Muskogee*, 119 F.3d 837 (10th Cir. 1997)...............................41

*Austin v. Hamilton*, 945 F.2d 1155 (10th Cir. 1991) .........................17, 18, 56, 57

*Buck v. City of Albuquerque*, 549 F.3d 1269 (10th Cir. 2008)...........................53

*Bryant v. Indep. Sch. Dist. No. I-38*, 334 F.3d 928 (10th Cir. 2003).....................3

*Caldwell v. Moore*, 968 F.2d 595 (6th Cir. 1992) ...............................37

*Callahan v. Poppell*, 471 F.3d 1155 (10th Cir. 2006) ..............................................

*Cameron v. Pontiac*, 813 F.2d 782, 786 (10th Cir. 1987) ..................................13

*Carr v. Castle*, 337 F.3d 1221 (10th Cir. 2003) ...................................21

*Casey v. City of Fed. Heights*, 509 F.3d 1278 (10th Cir. 2007) ..................*passim*

*City of Los Angeles v. Heller*, 475 U.S. 796 (1986) ...........................................32

*City of Los Angeles v. Lyons*, 461 U.S. 95 (1983)................................................32

*Cortez v. McCauley*, 478 F.3d 1108 (10th Cir. 2007) .............................20, 30, 57

*Cruz v. City of Laramie*, 239 F.3d 1183 (10th Cir. 2001) ...................................32

*Despain v. Uphoff*, 264 F.3d 965 (10th Cir. 2001)..............................................29

*Dixon v. Kirkpatrick*, 553 F.3d 1294 (10th Cir. 2009)......................................1, 8

*Dixon v. Richer*, 922 F.2d 1456 (10th Cir. 1991) .........................................34, 35

*Dodds v. Richardson*, 614 F.3d 1185 (10th Cir. 2010).......................................52

*Draper v. Reynolds*, 369 F.3d 1270 (11th Cir. 2004)....................................36, 37

*Estelle v. Gamble*, 429 U.S. 97 (1976) ..........................................................43, 44

*Farmer v. Brennan*, 511 U.S. 825 (1994)...............................................................50

*Fogarty v. Gallegos*, 523 F.3d 1147 (10th Cir. 2008) ..................................*passim*

*Frohmader v. Wayne*, 958 F.2d 1024 (10th Cir. 1992) .......................................16

*Fundiller v. City of Cooper City*, 777 F.2d 1436 (11th Cir. 1985).....................39

*Garcia v. Salt Lake Cnty.*, 768 F.2d 303 (10th Cir. 1985)..................................43

*Gouskos v. Griffith*, 122 F. App'x 965 (10th Cir. 2005) ..............................33, 34

*Graham v. Connor*, 109 S. Ct. 1865 (1989) ..................................................10, 18

*Green v. Post*, 574 F.3d 1294 (10th Cir. 2009) ...................................................19

*Griffith v. Coburn*, 473 F.3d 650 (6th Cir. 2007) ...............................................34

*Harris v. City of Circleville*, 583 F.3d 356 (6th Cir. 2009) ...............................18

*Holland v. Harrington*, 268 F.3d 1179 (10th Cir. 2001) ....................................52

*Hope v. Pelzer*, 536 U.S. 730 (2003) ...................................................................32

*Howard v. Waide*, 534 F.3d 1227 (10th Cir. 2008) .............................................45

*Hunt v. Uphoff*, 199 F.3d 1220 (10th Cir. 1999) .................................................46

*Hunter v. Young*, 238 F. App'x 336 (10th Cir. 2007).........................................36

*Jasper v. Thalacker*, 999 F.2d 353 (8th Cir. 1993)............................................37

*Jenkins v. Wood*, 81 F.3d 988 (10th Cir. 1996) .............................................53, 54

*Lopez v. LeMaster*, 172 F.3d 756 (10th Cir. 1999)..............................................50

v

*Lusby v. T.G. & Y. Stores, Inc.*, 749 F.2d 1423 (10th Cir. 1984),
  *vacated on other grounds sub nom. City of Lawton v. Lusby*,
  474 U.S. 805 (1985) ................................................................... 39

*Magruder v. Kuritz*, No. 10-cv-00062-ZLW-KLM,
  2010 U.S. Dist. LEXIS 129595 (D. Colo. Oct. 20, 2010) ............................ 27

*Mallory v. Jones*, No. 10-cv-02564-CMA-KMT,
  2011 U.S. Dist. LEXIS 48378 (D. Colo. May 3, 2011) ............................... 46

*Martin v. Bd. of Cnty. Comm'rs*, 909 F.2d 402 (10th Cir. 1990) ...................... 18

*Martinez v. Beggs*, 563 F.3d 1082 (10th Cir. 2009) .............................. 45, 48

*Mascorro v. Billings*, 656 F.3d 1198 (10th Cir. 2011) ................................. 8

*Mata v. Saiz*, 427 F.3d 745 (10th Cir. 2005) ................................... *passim*

*Meade v. Grubbs*, 841 F.2d 1512 (10th Cir. 1988) .................................... 55

*Michenfelder v. Sumner*, 860 F.2d 328 (9th Cir. 1988) ............................... 37

*Mick v. Brewer*, 76 F.3d 1127 (10th Cir. 1996) .................................. 38, 40

*Olsen v. Layton Hills Mall*, 312 F.3d 1304 (10th Cir. 2002) .................... *passim*

*O'Neill v. Krzeminski*, 839 F.2d 9 (2d Cir. 1988) ................................... 39

*Porro v. Barnes*, 624 F.3d 1322 (10th Cir. 2010) .................................... 18

*Ramos v. Lamm*, 639 F.2d 559 (10th Cir. 1980) ...................................... 44

*Romero v. Story*, 672 F.3d 880 (10th Cir. 2012) .................................... 57

*Roska v. Peterson*, 328 F.3d 1230 (10th Cir. 2003) ............................ *passim*

*Scott v. Harris*, 550 U.S. 372 (2007) ............................................ 9, 11

*Sealock v. Colorado*, 218 F.3d 1205 (10th Cir. 2000) ......................... 44, 47, 51

*Seegmiller v. Laverkin City*, 528 F.3d 762 (10th Cir. 2008) ........................42, 58

*Sevier v. City of Lawrence*, 60 F.3d 695 (10th Cir. 1995)....................................42

*Smith v. Gilpin Cnty.*, 949 F. Supp. 1498 (D. Colo. 1996)..................................57

*Tennessee v. Garner*, 471 U.S. 1 (1985).............................................................18

*Trujillo v. Goodman*, 825 F.2d 1453 (10th Cir. 1987) ........................................24

*Weigel v. Broad*, 544 F.3d 1143 (10th Cir. 2008) ...............................................39

*White v. Martin*, 425 F. App'x 736 (10th Cir. 2011)...........................................10

*Wise v. Bravo*, 666 F.2d 1328 (10th Cir. 1981)............................................13, 20

*York v. City of Las Cruces*, 523 F.3d 1205 (10th Cir. 2008)..................11, 12, 36

*Zuchel v. Spinharney*, 890 F.2d 273 (10th Cir. 1989) ....................................28, 29

RULES

FED. R. EVID. 803 ................................................................................................34

## STATEMENT OF RELATED CASES

The only Defendant parties to this appeal are Faun Gomez, James Grimes, Kyle Sharp, Kenneth Robinette, and Carrie Rodriguez. The resolution of this appeal will have no legal impact on Plaintiffs' claims against the City and County of Denver.

Plaintiffs' related claims against Denver Health and Hospital Authority, Nurse Gail George, and Nurse Susan Cryer have been resolved. A Stipulated Motion to Dismiss Case Number 12-1386, *Estate of Marvin Booker, et al. v. Denver Health and Hospital Authority, et al.*, is being filed contemporaneously herewith.

## JURISDICTIONAL STATEMENT

Plaintiffs-Appellees agree with Defendant-Appellants' Jurisdictional Statement with respect to the district court's jurisdiction and this appeal's timeliness. However, because the district court's denial of qualified immunity to each Defendant was based upon the multitude of remaining disputed facts, Applt.App. 1064, this Court lacks jurisdiction over this appeal. *Dixon v. Kirkpatrick*, 553 F.3d 1294, 1301 (10th Cir. 2009); Section I(A), *infra*.

## STATEMENT OF THE CASE

For over two years, the Booker family has been seeking justice for the July 9, 2010 killing of Marvin Booker by the Defendants. His family began seeking

answers from Denver immediately following his death.  Instead of acknowledging

responsibility, Denver and the individual Defendants have rebuffed the family at

every turn, causing needless and painful delays throughout this case.  This

frivolous[1] appeal of the district court's denial of the qualified immunity summary

judgment motions is merely Defendants' latest attempt at delaying justice.

Throughout this litigation, Defendants have repeatedly refused to allow the case to

proceed expeditiously.  In ruling upon Defendants' summary judgment motion, the

district court explicitly held that far too many material factual disputes remained

for the case to be summarily judged.  Despite Plaintiffs' warning that the district

court's fact-based decision was not properly subject to interlocutory appeal,

Defendants nonetheless filed this frivolous appeal, derailing the January 2013 trial

date.  Sadly, with this appeal pending, Reverend B.R. Booker, Sr., Marvin

Booker's father and a Plaintiff in this case, passed away, preventing him from

securing justice for his slain son during his lifetime.  The district court's entirely

appropriate decision below should be affirmed with all deliberate speed, so that

this case may proceed to trial and the Booker family may obtain the justice it has

now been seeking for almost three years.

[1] The district court did "not particularly disagree with the [P]laintiffs' characterization of the appeal" as frivolous, but denied Plaintiffs' Motion to Certify the Appeal as Frivolous due to the procedural complexities of the case. Applt.App. 1140, 1146.

# STATEMENT OF FACTS[2]

Defendants killed Marvin Booker on July 9, 2010.  Applt.App. 468, ¶¶ 29-

30.  Mr. Booker had been arrested in Denver on a warrant for a failure to appear.

He was taken to the Denver Jail, where he sat for several hours awaiting booking.

Upon being called for processing, Mr. Booker had a conversation with Defendant

Gomez.  Apparently frustrated that Mr. Booker would not sit down at the booking

desk, Gomez directed Mr. Booker to holding cell in the booking area.  *Id.* at 439-

40, ¶¶ 8-9.  Mr. Booker, who had left his shoes near his seat, informed Defendant

Gomez that he needed to retrieve his shoes before going to the cell.  *Id.* at 440-41,

¶ 11.  Defendant Gomez then initiated the confrontation with Mr. Booker that led

to his death.  *Id.* at 461-62, ¶ 2.   Instead of allowing him to retrieve his shoes,

Defendant Gomez grabbed Mr. Booker's arm, causing him to flail to evade her

grasp.  *Id.* at 441, ¶ 14.  Three other deputies – Defendants Grimes, Robinette, and

Sharp – rushed in and took Mr. Booker to the ground almost immediately.  *Id.* at

441-42, ¶¶ 15, 17.  Defendant Grimes held Mr. Booker in a carotid restraint for

approximately two and a half minutes.  *Id.* at 445-44, ¶¶ 19-20.  While Defendant

Grimes was holding Mr. Booker by the neck, Defendant Sharp applied OPNs to

_____

[2] For purposes of summary judgment, a court "must assume the facts as adequately
alleged by the non-moving party are true." *Bryant v. Indep. Sch. Dist. No. I-38*,
334 F.3d 928, 932 n.2 (10th Cir. 2003).

Mr. Booker's legs, and Defendant Robinette applied 50-75% of his 190 pounds of bodyweight to his back. *Id.* at 447, ¶ 28; 450, ¶40. Defendants cuffed Mr. Booker's hands behind his back as he lay face down on the floor with multiple types of force – including the carotid restraint – being inflicted upon him. *Id.* at 448, ¶ 32. During this time, numerous eyewitnesses heard Mr. Booker beg for help and plead that he could not breathe. *Id.* at 445-47, ¶ 22. Despite Mr. Booker's cries for help, Defendant Rodriguez, the on-scene supervisor, called for a Taser, which she then applied to Mr. Booker's leg for eight consecutive seconds – three seconds longer than a standard cycle. *Id.* at 448-49, ¶¶ 32-33. Defendants gave conflicting stories with respect to Mr. Booker's reaction to the Taser. *Id.* at 449, ¶33. Mr. Booker never hit, struck, or kicked anyone, from the time he was called to the booking desk to the time he was killed. *Id.* at 462, ¶ 3. After Defendant Rodriguez deployed the Taser against Mr. Booker, Defendant Grimes released the carotid restraint from Mr. Booker's neck. *Id.* at 449, ¶ 37. During the entire use of force incident, Defendants failed to communicate with one another about the types of force being used. *Id.* at 462, ¶ 7.

After Defendants unpiled from atop Mr. Booker, they carried him to a holding cell. *Id.* at 451, ¶¶ 42-43. None of the Defendants ever took any action to determine whether Mr. Booker was alive or conscious, despite the fact that multiple eyewitnesses said that Mr. Booker was not moving or was limp after

Defendant Grimes released the carotid restraint. *Id.* at 451, ¶ 41; 969, ¶ 12. This was a deliberate decision by each Defendant. *Id.* at 466, ¶ 21. Once Defendants carried Mr. Booker's body into the holding cell, they removed his handcuffs from behind his back and left him alone in the cell. *Id.* at 452-53, ¶ 44. Although none actually checked Mr. Booker's status, Defendants gave differing (and conflicting) accounts with respect to their observations of Mr. Booker leading them to testify that he remained conscious. *Id.* at 451-53, ¶¶ 42, 44; 970, ¶ 15.

Shortly after Defendants deposited Mr. Booker in the cell, Defendant Grimes looked in and noticed that Mr. Booker did not appear to be breathing, at which point he asked Defendant Sharp to get a nurse. *Id.* at 454, ¶¶ 48-49.[3] Nurse Gail George eventually came to the cell to assess Mr. Booker's condition. *Id.* at 298, ¶ 50; 454, ¶ 50. Efforts to revive Mr. Booker failed; he was transported to Denver Health and declared dead.

## SUMMARY OF THE ARGUMENT

As the district court properly held, this "is not a summary judgment case." Applt.App. 1064. Because "every one of [Plaintiffs' claims] turns on issues of fact

---

[3] Defendant Rodriguez, as the on-scene supervisor, was responsible for immediately obtaining medical attention after Defendants left Mr. Booker in the cell; instead of doing so, she first went to return to the Taser to the sergeants' office, and, once she reached the nurses' station, failed to convey that Mr. Booker needed immediate medical attention. Applt.App. 453, ¶ 46.

. . . [it] is not . . . even a close call." *Id.* Defendants attempt to manufacture legal issues for appeal out of whole cloth, based primarily upon the fact that the district court ruled from the bench instead of issuing a written ruling. While a written ruling may have more explicitly spelled out all of the remaining factual disputes and clearly established law precluding qualified immunity for each Defendant, the district court was armed with the voluminous briefing submitted by the parties. That briefing included Plaintiffs' Summary Judgment Response, Applt.App. 429-528, which laid out both the disputed material facts and the clearly established law for each claim against each Defendant, as well as Plaintiffs' Supplemental Summary Judgment Response, Applt.App. 966-977, which, upon the district court's request, provided ten pages chock full of the most material factual disputes, and to which the district court explicitly referred in denying Defendants' Motion. Applt.App. 1064. The combination of remaining material factual disputes and clearly established law prohibiting each Defendant's conduct renders summary judgment inappropriate in this case, and the district court's decision must be affirmed.

## ARGUMENT

This case is not one to be summarily judged because of the multitude of remaining disputed material facts. In addition, the district court properly concluded that it was not required to decide between the Fourth and the Fourteenth

Amendment for Plaintiffs' excessive force claim at the summary judgment stage, because Plaintiffs' version of the facts would survive either test. With respect to Plaintiffs' excessive force and failure to provide medical care claims, Plaintiffs provided the district court with evidence of ample factual disputes precluding a determination that no constitutional violation occurred, and with a plethora of clearly established law prohibiting each Defendant's conduct. Plaintiffs did the same with respect to their failure to supervise claim against Defendant Rodriguez. Finally, the district court did not err in considering all Defendants' conduct together for qualified immunity purposes. Thus, Defendants are not entitled to qualified immunity, and the district court's decision should be affirmed.

## I. The Record Contains a Myriad of Disputed Material Facts

The district court properly concluded that this "is not a summary judgment case" because "every one of [Plaintiffs' claims] turns on issues of fact." Applt.App. 1064. Defendants blithely assert that the video of Mr. Booker's killing resolves any lingering factual disputes. The district court correctly rejected this assertion. Further, based upon the briefing submitted to the district court, Defendants were unable to adequately resolve the abundant factual disputes asserted by Plaintiffs, thus rendering summary judgment inappropriate. The remaining disputed material facts require affirmance of the district court's denial of summary judgment.

## A. The District Court's Denial of Summary Judgment Because Plaintiffs' Claims Are "Riddled With Fact Disputes"[4] is not Appealable

It is well settled that "[a] district court's determination that the record raises a genuine issue of material fact, precluding summary judgment in favor of the defendants, is not appealable even in a qualified immunity case." *Kirkpatrick*, 553 F.3d at 1301 (internal quotation marks omitted). Thus, to the extent that Defendants assert that the district court improperly determined that factual disputes remained, this appeal is improper. The district court denied summary judgment based upon the multitude of factual disputes in the record:

> The entire excessive force part of this case is just riddled with fact disputes. They're set forth in summary [in Plaintiffs' Supplemental Summary Judgment Response, Applt.App. 966-977], but they're just everywhere in this case. Whether you look at it as a whole or go claim by claim through the claims that I'm denying summary judgment, every one of them turns on issues of fact; and for that reason, this is not, in my view, even a close call. It is not a summary judgment case.

Applt.App. 1064. Because the district court (properly) denied summary judgment based upon the remaining material factual issues, and because that conclusion is not subject to interlocutory appeal, this Court lacks jurisdiction over the current appeal to the extent it seeks reversal of the district court's determination that material facts remain in dispute. *Mascorro v. Billings*, 656 F.3d 1198, 1204 (10th

---

[4]Applt.App. 1064.

Cir. 2011) ("The district court properly determined issues of material fact were present with respect to these claims. We lack jurisdiction to review them.").

## B. The Video Does Not Resolve Material Fact Disputes

Defendants erroneously contend that the video resolves any lingering factual disputes. Appellants' Br. 29-35. Defendants' reliance on *Scott v. Harris*, 550 U.S. 372 (2007), to contend that this Court should reject Plaintiffs' asserted facts in favor of "the objective evidence scene in the videos" of Mr. Booker's killing, Appellants' Br. 16, is misplaced. In *Scott*, the Supreme Court rejected that plaintiff's demonstrably false allegations because the video "blatantly contradicted" his assertions. *Id.* at 378-79. Unlike the *Scott* Court, the district court here recognized that Plaintiffs were not making baseless allegations unsupported by the record, and in fact concluded that the video was not one-sided:

> Given the version of the facts that the plaintiff [sic] alleges – and they more than just allege it, *there is the video, which is subject to interpretation, there is apparently testimony from inmates who observed these proceedings, this incident and so forth* – if what happened is what the plaintiff [sic] claims, then any reasonable officer in Denver or anywhere else would know that that was excessive force. It's just not even a close call.

Applt.App. 1063-64 (emphasis added). This Court has made clear that, where "videos depict much of the encounter, but they leave open questions about the degree of [an individual's] resistance . . . and the timing and extent of force levied by [an officer]," a plaintiff's allegations that are consistent with the video and other

9

evidence may not be discounted. *White v. Martin*, 425 F. App'x 736, 743 (10th Cir. 2011).[5] In a remarkably similar case, this Court held:

> The videotapes do not depict every moment and do not capture unambiguously Mr. White's resistance, how much force Trooper Martin was using on Mr. White, and whether the force on Mr. White's neck began or continued beyond the point that Mr. White was not resisting arrest. We may infer that Mr. White acted reflexively in response to Trooper Martin's grabbing his wrist and arm. Moreover, inferences that Trooper Martin was choking Mr. White when Mr. White was not resisting, that Mr. White was not a threat to harm anyone or to flee, and that the choking limited Mr. White's ability to breathe are reasonable based on the record. In particular, the video recordings support the inference that Trooper Martin continued to choke Mr. White for ten to twelve seconds after Mr. White had stopped resisting, that during this time Trooper Martin was squeezing hard enough to make breathing difficult for Mr. White, and that Mr. White was gasping for air, and that Mr. White was looking at the other trooper on scene and pointing at Trooper Martin's hands around his throat.
>
> We conclude that, based on the facts viewed most favorably to Mr. White, Trooper Martin's conduct was objectively unreasonable under *Graham v. Connor* and that the district court was correct in determining that a reasonable jury could conclude that Trooper Martin violated Mr. White's Fourth Amendment right against the use of unreasonable excessive force.

*Id.* This Court has consistently rejected law enforcement officers' contentions that a plaintiff's allegations must automatically be set aside where an incident is caught on tape:

---

[5] All citations to unpublished cases are provided for their persuasive value, pursuant to Tenth Circuit Rule 32.1.

> [T]he police officers overstate the relevance of *Scott*, in which the court found "an added wrinkle," in the form of an unadulterated videotape that captured the entire incident. "The videotape quite clearly contradict[ed] the version of the story told by [the plaintiff] and adopted by the [lower courts]." The Court held that a court may not adopt a "blatantly contradicted" version of the facts for summary judgment purposes.
>
> By contrast, only part of the incident involving the Yorks and the police officers was captured on an audio tape, portions of which are unintelligible. Setting aside the fact that the court referenced the tape several times in its order and it is not "blatantly contradicted" by Mr. York's version of the events, the tape does not establish that the officers are entitled to summary judgment.

*York v. City of Las Cruces*, 523 F.3d 1205, 1210-11 (10th Cir. 2008) (internal citations and footnote omitted) (alterations in original). Here, even Defendants concede that "no single video or the totality of the videos can provide the entire perspective of what occurred during the roughly three minute use of force incident." Appellants' Br. 29. In Defendants' own words, "[t]he participants and the seating in the area obstruct the view at times, or the videos simply do not show the level of detail required to see some subtle movements." *Id.* The video in this case, when compared to Plaintiffs' allegations, is simply not as conclusive as the video in *Scott*, which "so utterly discredited" the plaintiff's allegations in that case that "no reasonable jury could have believed him." *Scott*, 550 U.S. at 380.[6] Thus,

---

[6] The video supports Plaintiffs' allegations. For example, there is no indication of resistance by Mr. Booker whatsoever on the video after he has been taken to the ground and covered by deputies.

Defendants cannot satisfy their burden to establish a lack of genuine material facts in dispute merely by pointing to the video. *See, e.g.*, *York*, 523 F.3d at 1210-11.

### C. Defendants Were Unable to Quiet Plaintiffs' Asserted Factual Disputes

The district court's conclusion that Plaintiffs' claims were "riddled with fact disputes," Applt.App. 1064, was unsurprising. Upon receiving Plaintiffs' 100-page Summary Judgment Response, approximately 15 pages of which recited disputed material facts, Applt.App. 461-75, the district court ordered Plaintiffs to submit a supplemental response pointing out only disputed facts. Applt.App. 956-57. Plaintiffs filed a 10-page brief full of disputed material facts, with citations to evidence in the record. Applt.App. 966-77.

Defendants' continued unavailing attempts to quiet disputed issues of fact are exemplified by their preposterous assertion that the cause of Mr. Booker's death – a fact that remains hotly in dispute – is immaterial. Applt.App. 986-87. Given that Plaintiffs have asserted that Defendants killed Mr. Booker – a fact central to Plaintiffs' excessive force, deprivation of life without due process, and failure to provide medical care claims (Applt.App. 124, ¶¶ 134, 136; 125, ¶ 143; 126, ¶ 152) – it is unfathomable that the cause of death is immaterial. The law on this point is clear. With respect to Plaintiffs' excessive force and deprivation of life claims, even if analyzed under the Fourteenth Amendment standard, one of the

three factors to be considered in evaluating an officer's use of force is "the extent of the injury inflicted." *Roska v. Peterson*, 328 F.3d 1230, 1243 (10th Cir. 2003). If, as Defendants imply, Mr. Booker's heart essentially spontaneously combusted (Applt.App. 285 ("By the time Booker interacted with the subject deputies in July of 2010, he possessed most, if not all, of the class symptoms for somebody at risk of sudden cardiac death")), and would have done so even absent the use of force, Defendants' force did not cause Mr. Booker's death. *Cameron v. Pontiac*, 813 F.2d 782, 786 (10th Cir. 1987) (noting that the deceased plaintiff's "estate could not recover unless the constitutional violation was a proximate cause of his death"). If, on the other hand, as Plaintiffs allege (and the Coroner concluded), Mr. Booker's death was caused by Defendants' combined uses of force on him, Defendants may be liable for his death. *Wise v. Bravo*, 666 F.2d 1328, 1333-34 (10th Cir. 1981) (noting that a Section 1983 claim may be available where, "the state officer's action caused severe injuries"). It thus defies logic to contend that the cause of Mr. Booker's death – still hotly in dispute (Applt.App. 468-69, ¶¶ 29-31; 974, ¶¶ 32-33; 986-87, ¶¶ 32-33) – is immaterial.

Defendants' attempts at performing legal gymnastics in order to quiet Plaintiffs' asserted disputed material facts are unpersuasive. Numerous material facts remain in dispute, and the district court properly denied summary judgment on that basis.

## D. A Multitude of Material Facts Remain in Dispute

For a full recitation of all of the remaining factual disputes, Plaintiffs refer to the Court the fact sections of the briefs filed in the district court. Applt.App. 289-301; 439-475; 966-975; 978-989. For purposes of affirming the district court's denial of summary judgment, the following selection of remaining disputed material facts is sufficient.

First, the cause of Mr. Booker's death remains in dispute – a point Defendants have explicitly conceded. Applt.App. 986, ¶32. Further, Mr. Booker's level of resistance throughout the struggle is disputed. *Id.* at 966, ¶ 1; 968, ¶ 6; 979, ¶ 1; 981, ¶ 6. Defendant Grimes's application of the carotid restraint is engulfed in factual disputes, including whether and how he applied the restraint and the need (if any) for doing so. *Id.* at 967-68, ¶¶ 4-5; 980-81, ¶¶ 4-5. Despite Defendants' repeated assertions that the deputies' testimony is "undisputed," Appellants' Br. 29, Plaintiffs have pointed to the deputies' own radically conflicting testimony on this point. Applt.App. 443-47, ¶¶ 19-20, 22 (citing testimony of Grimes, Sharp, Rodriguez, Robinette, and other Denver officials, and the video). The justification for and necessity of using a Taser on Mr. Booker when his hands were already cuffed behind his back as he was prone on the floor with all five Defendants on or over him remains disputed. *Id.* at 968, ¶¶ 7-9; 981, ¶¶ 7-9. Defendants' contention that "Booker's ongoing struggling is evidenced"

by the video is belied by their concession that "the ability to observe resistance in the video is limited." *Id.* at 981, ¶ 8. Importantly, Mr. Booker's condition after Grimes released the carotid restraint remains in dispute. *Id.* at 969, ¶ 11; 982, ¶ 11.[7] Whether Mr. Booker was alive or conscious while being carried to the cell remains in dispute. *Id.* at 970, ¶ 15; 983, ¶ 15.[8] Defendants' efforts to get Mr. Booker the medical care he desperately needed also remains disputed. *Id.* at 453, ¶ 46; 970-71, ¶¶ 17-18; 983, ¶¶17-18. Defendant Rodriguez's actions in her capacity as the on-scene supervisor are in dispute. *Id.* at 442-43, ¶ 18; 969-70, ¶ 13; 983, ¶ 13.[9]

Where, as here, a plaintiff's version of the facts and a defendant's version of the facts differ greatly, a court may not grant summary judgment based upon the defendant's version of the facts:

> In order to affirm the district court's disposition of [plaintiff's] excessive force claim we would essentially have to adopt

---

[7] Defendants' attempts to quiet this important disputed fact are unavailing, as the inmates whose statements constitute hearsay in written form can be called to testify live at trial.

[8] While each deputy testified that he/she thought Mr. Booker was conscious, none ever took any steps to make that determination. Applt.App. 451-52, ¶¶ 41-42; 969, ¶ 12; 982, ¶ 12.

[9] Defendants' assertion that Defendant Rodriguez's role is undisputed based on the video and her own testimony, Applt.App. 983, ¶ 13, is contradicted by the conflicting testimony of Defendant Robinette. Applt.App. 442-43, ¶18.

[defendant's] view of the provocation (that [plaintiff] was belligerent, uncooperative, and hurting himself) and the consequences (that [plaintiff] received no serious injury) over [plaintiff's] contrary contentions (that he was not a threat to himself or anyone else, that he was being punished for the altercation which preceded his arrest, and that he suffered serious nerve injury). Courts may not resolve disputed questions of material fact in order to grant summary judgment. . . . [C]ourts, at the summary judgment level, are required to take the facts and reasonable inferences in the light most favorable to the party opposing summary judgment.

*Frohmader v. Wayne*, 958 F.2d 1024, 1027-28 (10th Cir. 1992).

The lingering factual disputes described in this section, combined with the additional material factual disputes listed in the briefing below, confirm the propriety of the district court's denial of summary judgment based upon a plethora of remained disputed material facts.

## II. The District Court was not Required to Decide Between the Fourth and Fourteenth Amendments

Plaintiffs initially pled their excessive force claim pursuant to the Fourth Amendment. Applt.App. 55. In moving for summary judgment, Defendants asserted that Plaintiffs' excessive force claim should be analyzed pursuant to the Fourteenth Amendment, and combined their briefing with respect to the excessive force claim and the deprivation of life without due process claim (pled pursuant to the Fourteenth Amendment, Applt.App. 56). Applt.App. 304-07. Out of an

abundance of caution, Plaintiffs briefed both claims pursuant to the Fourteenth Amendment.[10]

In response to the court's questioning during oral argument, Plaintiffs explained that their excessive force claim is "viable under the Fourth or Fourteenth Amendment," but asserted that the "viability of the claim" did not "sink[] or swim[] at the summary judgment [stage] on that distinction." *Id.* at 1030-31. The district court agreed, instructing Defendants, "If they could prove what they've said happened, *you're going to get clobbered under any excessive force standard*, right? If they could prove these facts, as they allege them, you're dead in the water, *whether it's the Fourteenth or the Fourth*." *Id.* at 1039 (emphases added). Relying on *Austin v. Hamilton*, 945 F.2d 1155 (10th Cir. 1991), the district court correctly determined that, while a decision between the Fourth and Fourteenth Amendments would have "to be made before this is decided by a jury," the decision did not "ha[ve] to be made now." Applt.App. 1063.

In *Austin*, this Court held "that under *either a fourth amendment or substantive due process standard*, . . . a reasonable officer could [not] have believed the manner of plaintiff[s]' arrest and detention in this case to be

---

[10] If Plaintiffs' excessive force claim survives under a Fourteenth Amendment analysis (and it does), it also survives under the less stringent Fourth Amendment analysis. *See* n.12, *infra*.

constitutionally permissible, in light of clearly established law and the information

defendants possessed at the time." *Austin*, 945 F.2d at 1158 (internal quotation

marks omitted) (emphasis added). The *Austin* Court relied on Tenth Circuit

precedent establishing that, where a plaintiff's allegations are sufficient to meet

either standard, a court does not need to decide which amendment is applicable at

the summary judgment stage:

> [P]rior to the Graham decision in 1989, the circuit courts had not
> clearly settled whether the objective fourth amendment
> "reasonableness" standard already employed by the Supreme Court in
> *Tennessee v. Garner*, 471 U.S. 1 (1985) to evaluate a claim for
> improper use of deadly force in arrest would also apply to claims
> involving excessive but nondeadly force in arrest. The use of
> nondeadly force had previously been analyzed generally under a
> subjective and more onerous substantive due process standard
> requiring, in addition to undue force, personal malice amounting to an
> abuse of official power sufficient to "shock the conscience." This
> uncertainty in the law does not affect our disposition in the present
> case, however, since *plaintiff's allegations describe official conduct
> sufficiently reprehensible to constitute a clear violation of either
> standard*.

*Martin v. Bd. of Cnty. Comm'rs*, 909 F.2d 402, 407 n.5 (internal citations omitted)

(emphasis added). This Circuit is not alone in holding that, despite the general

requirement that a court first determine which constitutional amendment is at issue,

*Porro v. Barnes*, 624 F.3d 1322, 1325 (10th Cir. 2010), where a plaintiff's

allegations are sufficient under either standard, a court need not make that decision

before denying summary judgment. *See, e.g.*, *Harris v. City of Circleville*, 583

F.3d 356, 373 (6th Cir. 2009) ("[B]ecause . . . Defendants' conduct was unconstitutional under any standard, it is irrelevant for qualified immunity purposes whether Harris' claims are controlled by the Fourth or Fourteenth Amendment.").

As fully explained in Section III, *infra*, Plaintiffs' allegations are sufficient to establish a constitutional violation under either the Fourth or Fourteenth Amendment, and the district court was therefore not required to determine which applied before denying Defendants qualified immunity.

### III. The District Court Properly Concluded that Defendants are not Entitled to Qualified Immunity on Plaintiffs' Excessive Force Claim[11]

A defendant is not entitled to qualified immunity if disputed facts preclude a conclusion that no constitutional violation occurred, and if the law prohibiting the defendant's conduct was clearly established at the time the conduct occurred. *Green v. Post*, 574 F.3d 1294, 1300 (10th Cir. 2009). Because Plaintiffs have met both prongs of this test, the district court's denial of summary judgment should be affirmed.

---

[11] This analysis also incorporates Plaintiffs' deprivation of life without due process claim.

## A. Disputed Facts Preclude a Determination that the Use of Force Did not Violate Mr. Booker's Constitutional Rights

The Due Process Clause of the Fourteenth Amendment prohibits the infliction of excessive force against pre-trial detainees. *Roska*, 328 F.3d at 1243. A court "examine[s] three factors in determining whether force was excessive within the meaning of the Fourteenth Amendment: (1) the relationship between the amount of force used and the need presented; (2) the extent of the injury inflicted; and (3) the motives of the state actor." *Id.*[12] "If the state officer's action caused severe injuries, was grossly disproportionate to the need for action under the circumstances and was inspired by malice rather than merely carelessness or unwise, excessive zeal amounting to an abuse of official power that shocks the conscience, it may be redressed under §1983." *Wise*, 666 F.2d at 1333-34.

At the summary judgment stage, Plaintiffs do not bear the burden of proving that Defendants violated Mr. Booker's constitutional rights. Rather, at this point in the litigation, Plaintiffs must establish only that genuine issues of material fact

---

[12] The analysis of a Fourth Amendment excessive force claim is subsumed by that of a Fourteenth Amendment claim. To succeed on a Fourth Amendment claim, "a plaintiff must show: (1) that the officers used greater force than would have been reasonably necessary to effect a lawful seizure, and (2) some actual injury caused by the unreasonable seizure that is not de minimis." *Cortez v. McCauley*, 478 F.3d 1108, 1129 n.25 (10th Cir. 2007). These are essentially the first two *Roska* factors. Thus, if Plaintiffs survive summary judgment under the Fourteenth Amendment, they survive under the Fourth Amendment.

remain, and that a reasonable jury could infer from the disputed facts that they are able to prove their claims. *Carr v. Castle*, 337 F.3d 1221, 1229 n.9 (10th Cir. 2003). It is well established that "this court will not approve summary judgment in excessive force cases – based on qualified immunity or otherwise – if the moving party has not quieted all disputed issues of material fact." *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1314 (10th Cir. 2002). Based upon the multitude of disputed facts, discussed in Section I(D), *supra*, and below, a reasonable jury could conclude that each Defendant violated Mr. Booker's constitutional right to be free from the use of excessive force.

### 1. Disputed Facts Preclude a Determination that Defendant Grimes's Use of Force was Constitutional

Material circumstances regarding Defendant Grimes's application of the carotid restraint are disputed by the parties – and even among Defendants themselves. Factual issues remain regarding all three of the *Roska* factors: whether Defendant Grimes's force was reasonable in light of the need presented, how severely Mr. Booker was injured as a result of the carotid restraint, and what motivated Defendant Grimes. *Roska*, 328 F.3d at 1243.

Defendant Grimes unequivocally testified that he (correctly) applied a carotid restraint to Mr. Booker, and that testimony was consistent with the observations of Deputy Marr, who provides carotid restraint training for Denver,

and Captain Swift, who conducted the Internal Affairs investigation into Mr. Booker's death. Applt.App. 293, ¶ 19; 443-44, ¶ 19; 967-68, ¶¶ 4-5; 980-81 ¶¶ 4-5. Defendants themselves, however, created a material factual dispute regarding the force used by Defendant Grimes by subsequently asserting that he merely "attempted" to apply the carotid restraint to Mr. Booker. *Id.* at 293, ¶ 19; 443-44, ¶ 19. Further, Defendants' own testimony regarding the way in which Defendant Grimes applied the carotid restraint creates a genuine issue of material fact. *Id.* at 293, ¶ 20; 444-45, ¶ 20; 967-68, ¶¶ 4-5; 980-81, ¶¶ 4-5. Defendant Sharp testified that his observations of the way Defendant Grimes applied the carotid restraint were inconsistent with Defendant Grimes's own description of his actions. *Id.* at 444-45, ¶ 20. With no undisputed rendition of whether and how Defendant Grimes applied the carotid restraint to Mr. Booker, it is impossible to definitively determine (at least in favor of Defendant Grimes) whether Defendant Grimes's force was reasonable in light of the need presented, and qualified immunity is inappropriate. *Olsen*, 312 F.3d at 1314.

Also in dispute is Mr. Booker's response to the use of force against him. Defendants contend that he was violently resisting, whereas Plaintiffs rely on the observations of independent eyewitnesses that Mr. Booker was, at most, defensively struggling to breathe under the weight of the deputies and the multiple types of force being inflicted upon him. Applt.App. 293-94, ¶¶ 21-22; 445-47,

¶¶ 21-22.  Where the parties dispute the level of resistance displayed by the person against whom force was used, qualified immunity is not appropriate.  *Olsen*, 312 F.3d at 1315.  This dispute also prevents evaluation of the first *Roska* factor.

The effect of the carotid restraint on Mr. Booker is likewise disputed.  Mr. Booker died as a result of the use of force against him.  Applt.App. 295-96, ¶¶ 29-31; 468-69, ¶¶ 29-31; 974, ¶¶ 32-33; 986-87, ¶¶ 32-33.  Denver's Coroner and Plaintiffs' medical experts opined that Mr. Booker's death was caused by Defendants' use of force, including (especially) the carotid restraint.  *Id.* at 468-69, ¶ 31.  In the district court, Defendants contended that "the undisputed evidence establishes that Booker continued to resist during the attempted restraint (and thus was conscious)."  *Id.* at 309.  Defendants' own deposition testimony, however, contradicts that assertion.  *Id.* at  449, ¶ 33 (noting that Defendants testified that Mr. Booker stopped resisting during or immediately after deployment of the Taser – while Defendant Grimes was still applying the carotid restraint).  It is undisputed that the ultimate injury Mr. Booker suffered was death, and that the manner of death was homicide.  *Id.* at 295-96, ¶¶ 29-31; 468-69, ¶¶ 29-31; 974, ¶¶ 32-33; 986-87, ¶¶ 32-33.  Still in dispute, apparently, is the cause of Mr. Booker's death.  Without an undisputed factual basis establishing that the carotid restraint *did not* constitute a cause of Mr. Booker's death, the second *Roska* factor cannot be evaluated, and qualified immunity is inappropriate.

With respect to the third *Roska* factor, Defendants contend that there is "nothing in the record to suggest that [Defendant Grimes] was motivated by malice and a sadistic intent to cause harm." Appellants' Br. 38. Defendants provide no evidentiary support for this conclusory statement. Motive and intent are most frequently based upon inferential evidence, and are particularly appropriate for resolution by a jury. *Trujillo v. Goodman*, 825 F.2d 1453, 1460 (10th Cir. 1987). Defendant Grimes's application of the carotid restraint for two and a half minutes – well past the one-minute mark suggested by Denver's training – could lead a reasonable jury to conclude that he acted maliciously to cause harm to Mr. Booker. Applt.App. 293, ¶ 19; 301, ¶ 64; 443-44, ¶ 19; 460-61, ¶ 64. Further, given that "Mr. Booker was immobilized and prone almost from the inception of when Deputy Grimes applied the neck hold," a jury would certainly be reasonable in concluding that Defendant Grimes's motives were sadistic. *Id.* at 444-45, ¶ 20.

Because disputed issues of material fact remain regarding how all three *Roska* factors apply to Defendant Grimes's use of force, the district court properly denied him qualified immunity.

### 2. Disputed Facts Preclude a Determination that Defendant Rodriguez's Use of Force was Constitutional

As with Defendant Grimes's use of the carotid restraint, genuine issues of material fact remain in dispute with respect to the application of each *Roska* factor to Defendant Rodriguez's use of the Taser, precluding qualified immunity.

With respect to the level of force used in comparison to the need presented, *Roska*, 328 F.3d at 1243, material facts regarding Mr. Booker's resistance at the time Defendant Rodriguez deployed the Taser remain in dispute. Applt.App. 293-94, ¶¶ 21-22; 296, ¶¶ 31-32; 445-47, ¶¶ 21-22; 448, ¶¶ 31-32; 968, ¶¶ 7-9; 981, ¶¶ 7-9. In fact, Mr. Booker was already completely restrained and handcuffed, but Defendant Rodriguez tased him anyway. *Id.* at 968, ¶ 9; 981, ¶ 9.

Likewise, the extent of the injury caused by the Taser is disputed. *Roska*, 328 F.3d at 1243. Even Defendants' own testimony regarding the effect of the Taser on Mr. Booker is conflicting. Applt.App. 296, ¶¶ 33-35; 449, ¶¶ 33-35. Ignoring this conflicting evidence, Defendants now maintain that the Taser "seemed to have no effect on [Mr.] Booker." Appellants' Br. 41. Denver's Coroner and Plaintiffs' medical experts concluded that the Taser, along with the other uses of force, contributed to Mr. Booker's death. Applt.App.468-69, ¶ 31; 735-43; 974, ¶ 33; 987, ¶ 33. Given these material factual disputes, the district

court properly determined that it could not summarily judge the second *Roska* factor.

Analysis of the final *Roska* factor, Defendant Rodriguez's state of mind, *Roska*, 328 F.3d at 1243, is also complicated by factual disputes. Defendants assert that Defendant Rodriguez was motivated by Mr. Booker's continued resistance. Appellants' Br. 41. However, Plaintiffs provide evidence that Mr. Booker was not materially resisting at the time Defendant Rodriguez deployed the Taser, including the fact that he was handcuffed with five deputies on or near him. Applt.App. 296, ¶ 32; 448, ¶ 32; 968, ¶ 9; 981, ¶ 9. Given that Mr. Booker was completely restrained at the time he was tased, and that Defendant Rodriguez deployed the Taser for eight sustained seconds – three seconds longer than the standard Taser cycle, *Id.* at 449, ¶ 33 – a reasonable jury could conclude that Defendant Rodriguez maliciously used the Taser to inflict harm and pain on Mr. Booker. In fact, use of force expert Steven Martin concluded that Defendant Rodriguez "deploy[ed] the Taser in a manner that inflict[ed] punishment for reactive/reflexive movements." *Id.* at 448, ¶ 32. Even where an individual resists being handcuffed,[13] use of a Taser may be excessive, depending upon other types

---

[13]When Defendant Rodriguez tased Mr. Booker, he was fully restrained and handcuffed. Applt.App. 448, ¶ 32.

of force being used. *Magruder v. Kuritz*, No. 10-cv-00062-ZLW-KLM, 2010 U.S. Dist. LEXIS 129595, at *14 (D. Colo. Oct. 20, 2010).

Because genuine issues of material fact remain regarding all three of the *Roska* factors, the district court properly denied Defendant Rodriguez qualified immunity.

### 3. Disputed Facts Preclude a Determination that all Defendants' Failures to Intervene Did not Violate Mr. Booker's Constitutional Rights

Numerous disputed issues of material fact preclude granting Defendants summary judgment based on qualified immunity on Plaintiffs' excessive force claims because all of the Defendants failed to intervene to stop the others from using excessive force.   This Court has explained that, when plaintiffs and defendants allege completely different factual circumstances surrounding a use of force, summary judgment (via qualified immunity or otherwise) is not appropriate:

> On the issue of excessive force, neither party's asserted material facts jibe with those of the other. Officer King says that Appellant behaved belligerently before he attempted to handcuff him. Appellant and his children say that Appellant did nothing but cooperate passively. Officer King contends that Appellant tried to resist the arrest by "turning in to me, which just made me hold on to the control hold." . . . Appellant maintains that he complied physically at all times. . . . Appellant says that Officer King pushed Appellant at least 10 feet into a store window to effectuate the arrest. Officer King tells a far more subdued tale of "maneuvering [Appellant] against a storefront window [to] gain[] the necessary leverage to handcuff him."…Officer King mentions nothing about manhandling Appellant during the arrest process. Appellant asserts that Officer King "cocked

27

[his arm] at an angle, . . . clear up the middle of [his] back. . . . Although the district court erred in granting summary judgment via qualified immunity, the overwhelming number of factual divergences scream the obvious -- that material disputed facts obviously remain as to the excessive force claim. The court erred in granting summary judgment on the excessive force issue.

*Olsen*, 312 F.3d at 1315.

Defendants' allegedly "undisputed" facts are, in fact, disputed by voluminous evidence in the record, rendering summary judgment inappropriate. *Zuchel v. Spinharney*, 890 F.2d 273, 274 (10th Cir. 1989) ("This rather one-sided factual summary provided by [defendant] . . . is only part of the picture presented by the evidentiary record which is before us. Other testimony and evidence contained in the summary judgment record casts doubt on the objective reasonableness of [defendant's] use of deadly force."). For example, Plaintiffs and Defendants disagree about what happened during the initial exchange between Defendant Gomez and Mr. Booker. Applt.App. 290-91, ¶¶ 8, 9, 11; 439-41, ¶¶ 8, 9, 11; 967, ¶ 2; 979-80, ¶ 2. Defendant Gomez's description of the events at the booking desk is impeached by the video evidence. *Id.* at 291, ¶ 9; 440, ¶ 9; 966, ¶ 1; 979, ¶ 1. In addition, Defendant Gomez's justification for not allowing Mr. Booker to merely retrieve his shoes, namely, that inmates are not permitted to have shoes in the I-cells, is belied by the fact that Denver has no such policy. *Id.* at 291, ¶ 11; 440-41, ¶ 11. Further, each side describes Defendants' takedown of Mr.

Booker differently, with Defendants' version supported (in part) by some of their testimony, and Plaintiffs' version supported by the video and independent eyewitness accounts. *Id.* at 292, ¶¶ 15, 17; 441-42, ¶¶ 15, 17; 967, ¶ 3; 980, ¶ 3. Defendants themselves created a disputed issue of material fact regarding whether Defendant Grimes even applied a carotid restraint to Mr. Booker. *Id.* at 293, ¶ 19; 443-44, ¶ 19; 967, ¶ 4; 980, ¶ 4. Plaintiffs' and Defendants' versions of Mr. Booker's level of resistance once on the ground and the resulting necessity to use force are worlds apart. *Compare id.* at 293-94, ¶¶ 20-22; 295, ¶ 29; 296, ¶¶ 32-36 *with id.* at 444-47, ¶¶ 20-22; 447, ¶ 29; 448-49, ¶¶ 32-36. Plaintiffs dispute Defendants' contention that the they knew that Mr. Booker remained conscious after the use of force. *Id.* at 297, ¶¶ 41-42; 451-52, ¶¶ 41-42; 969, ¶ 12; 982, ¶ 12. Moreover, Defendants' observations of Mr. Booker while he was being carried to and once he was in the cell are inconsistent even among themselves, as well as with third-party accounts, creating additional disputed issues of material fact. *Id.* at 297-98, ¶¶ 42, 44; 451-53, ¶¶ 42, 44. This multitude of genuine issues of disputed material fact precludes summary judgment on Plaintiffs' excessive force claims. *Zuchel*, 890 F.2d at 275; *Despain v. Uphoff*, 264 F.3d 965, 977 (10th Cir. 2001) (factual disputes regarding the severity of the situation and Defendants' personal knowledge must be resolved by a jury).

## B. The Law Prohibiting Defendants' Use of Force was Clearly Established

Defendants attempt to make much of Plaintiffs' reliance on Fourth Amendment law to satisfy their burden of providing clearly established law prohibiting Defendants' conduct.[14] This attempt fails, however, as the analysis of a Fourth Amendment excessive force claim essentially mirrors that of a Fourteenth Amendment claim, except that a Fourteenth Amendment claim contains an additional state of mind requirement. Thus, cases establishing that a particular use of force is unreasonable under the Fourth Amendment establish that the same force is unreasonable under the Fourteenth Amendment. *Compare Cortez*, 478 F.3d at 1129 n.25 *with Roska*, 328 F.3d at 1243. Because, as discussed in Section III(A), *supra*, Plaintiffs have presented facts allowing a reasonable jury to infer that Defendants acted with the requisite state of mind pursuant to the Fourteenth Amendment, the district court properly determined that the law prohibiting Defendants' conduct was clearly established.

---

[14] Plaintiffs pled their excessive force claim pursuant to the Fourth Amendment, and the district court did not definitively decide whether the Fourth or the Fourteenth Amendment governs the claim.

## 1. The Law Prohibiting Defendant Grimes's Use of Force was Clearly Established

Defendants' attempts to distinguish the carotid restraint from other types of neck holds, Appellants'Br.35-38, are unavailing. Use of force expert Steve Martin explained that such an argument creates a distinction without a difference. Applt.App. 662 ("Regardless of the nomenclature used by Deputy Grimes (carotid restraint or choke hold), the danger associated with a hold encircling the subject's neck for a prolonged period with varying degrees of pressure (such that the subject sustained multiple neck injuries), is so obviously and potentially lethal that such an **amount** [emphasis added] of force must be accompanied by a concomitant **need** [emphasis added] to apply such a tactic."). Mr. Martin's opinion is consistent with the United States Supreme Court's treatment of the carotid restraint/chokehold:

> The police control procedures at issue in this case are referred to as "control holds," "chokeholds," "strangleholds," and "neck restraints." All these terms refer to two basic control procedures: the "carotid" hold and the "bar arm" hold. In the "carotid" hold, an officer positioned behind a subject places one arm around the subject's neck and holds the wrist of that arm with his other hand. The officer, by using his lower forearm and bicep muscle, applies pressure concentrating on the carotid arteries located on the sides of the subject's neck. The "carotid" hold is capable of rendering the subject unconscious by diminishing the flow of oxygenated blood to the brain. The "bar arm" hold, which is administered similarly, applies pressure at the front of the subject's neck. "Bar arm" pressure causes pain, reduces the flow of oxygen to the lungs, and may render the subject unconscious.

*City of Los Angeles v. Lyons*, 461 U.S. 95, 97 n.1 (1983). The *Lyons* Court

referred to the restraint as "the carotid artery chokehold." *Id.* at 100.[15]

Even if the names were not virtually synonymous, using case law involving

the "chokehold" to establish that Defendant Grimes's use of the "carotid restraint"

was unconstitutional adheres to the long-standing principle that "officials can still

be on notice that their conduct violates established law even in novel factual

circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2003). Indeed, "[a]lthough

earlier cases involving 'fundamentally similar' facts can provide especially strong

support for a conclusion that the law is clearly established, they *are not necessary*

*to such a finding*. The same is true of cases with 'materially similar' facts." *Id.*

(emphasis added). "The plaintiff is not required to show . . . that the very act in

question previously was held unlawful in order to establish an absence of qualified

immunity." *Cruz v. City of Laramie*, 239 F.3d 1183, 1187 (10th Cir. 2001). Thus,

Defendants' assertion that "[t]here is essentially no case law in this or any other

circuit," governing Defendant Grimes's use of the carotid restraint, Appellants' Br.

---

[15] Justice Stevens also referred to the carotid restraint as "a chokehold" in another
case. *City of Los Angeles v. Heller*, 475 U.S. 796, 802 (1986) (Stevens, J.,
dissenting) ("The Los Angeles Police Department says that if that compliance hold
fails to work the next degree of force to be used is a chokehold or, as the police
department calls them, a carotid control hold and modified carotid hold and bar
arm control holds." (internal quotation marks omitted)).

35, is belied by the voluminous authority Plaintiffs provided to the district court establishing that the use of a neck hold in similar circumstances is unconstitutional. Applt.App. 49-51.

For example, this Court has held that a district court should not grant qualified immunity where disputed issues of material fact surrounding the necessity of the use of a neck hold remain:

> [Defendant] claims that, because [plaintiff] allegedly bit him when [defendant] was choking him, [defendant's] behavior was reasonable. This assertion begs the question whether the choking was a reasonable response in the first place, and, again [plaintiff] disputes that he bit [defendant]. But even if he did, when an officer in making a lawful arrest uses more force or aggression than is reasonably necessary, the party so assaulted has the right of self-defense and may repel the attack with sufficient force to avert its threatened consequences, using no more force than is necessary. A jury should decide whether [defendant's] and [plaintiff's] responses were reasonable.

*Gouskos v. Griffith*, 122 F. App'x 965, 976-77 (10th Cir. 2005) (internal quotation marks and citation omitted). This Court has likewise made clear that genuine issues of material fact regarding the reasonableness of an officer's use of a neck hold preclude granting qualified immunity:

> [Plaintiff] pointed out to the district court that there were genuine issues of material fact regarding whether [defendant's] alleged perceptions were reasonable or whether he was lying and whether [plaintiff] was struggling to avoid being handcuffed or simply trying to avoid injury while he was being knocked to the ground. He also argued that [defendant] had failed to rebut witness testimony that [defendant] continued to choke [plaintiff] and stomped on his back after he had been subdued and handcuffed. We conclude that the

district court improperly resolved the excessive force/qualified immunity issue by totally discounting [plaintiff's] and his eyewitnesses' testimony.

*Id.* at 977 (internal citations omitted). Finally, it is clearly established that once an individual is under control, the additional use of force – including a neck restraint – may be excessive:

[Plaintiff's] response to being kicked the first time (turning around and swearing at [defendant]) could reasonably have been interpreted as an act of resistance. [Defendant's] initial response, calling for backup, . . . was both reasonable and prudent. But when [plaintiff] was kicked (the second time), struck with a flashlight, and then choked and beaten, he had already been frisked, had his hands up against the van with his back to the officers, and was not making any aggressive moves or threats. While it is reasonable to frisk a detainee suspected of carrying a weapon, it is not reasonable to hit him in the stomach with a flashlight, or choke and beat him, solely on the basis of that suspicion.

*Dixon v. Richer*, 922 F.2d 1456, 1463 (10th Cir. 1991) (internal citation omitted).[16]

The district court properly concluded, with respect to Defendant Grimes, that, "if what happened is what the plaintiff claims, then any reasonable officer in Denver or anywhere else would know that it was excessive force. It's just not even

_____

[16] This Circuit is not alone in establishing that the gratuitous use of a neck restraint is unconstitutional. *See, e.g.*, *Griffith v. Coburn*, 473 F.3d 650, 659 (6th Cir. 2007). The extent to which Mr. Booker posed a threat to Defendants, if any, remains in dispute. Applt.App. 966, ¶1; 968, ¶ 6; 979, ¶ 1; 981, ¶ 6. Defendants' contention that the inmate statements contain inadmissible hearsay is incorrect, as statements made by Mr. Booker during the struggle are admissible pursuant to (at least) FED. R. EVID. 803(1)-(3).

a close call." Applt.App. 1064. Defendant Grimes is not entitled to qualified immunity.

### 2. The Law Prohibiting Defendant Rodriguez's Use of Force was Clearly Established

Defendants erroneously contend that Defendant Rodriguez is entitled to qualified immunity because it was not clearly established that she could not deploy a Taser on Mr. Booker, who "was not yet fully under control." Appellants' Br. 39. As an initial matter, Plaintiffs dispute that Mr. Booker was not under control when he was tased. Applt.App. 448, ¶ 32 (noting that Mr. Booker's "hands were cuffed behind his back in a prone position" when the Taser was deployed). Furthermore, the law prohibiting Defendant Rodriguez's use of the Taser was clearly established.

This Court has clearly established that "it is excessive to use a Taser to control a target without having any reason to believe that a lesser amount of force – or even a verbal command – could not exact compliance," even where "the policy of [a] police department is that a Taser can appropriately be used to 'control' a target." *Casey v. City of Fed.Heights*, 509 F.3d 1278, 1286 (10th Cir. 2007). Furthermore, it is clearly established that the use of additional force after an individual is restrained may constitute excessive force. *Richer*, 922 F.2d at 1463. Even the *threat* of deploying a Taser, when combined with an arm-bar takedown

and an officer placing his knee in the middle of an individual's back, can amount to excessive force. *York*, 523 F.3d at 1211. All of these forces, and much more, had been inflicted on Mr. Booker.

Defendants' reliance on *Hunter v. Young*, 238 F. App'x 336 (10th Cir. 2007), is unpersuasive, as the undisputed facts in *Hunter* established that the plaintiff refused to obey the defendant officer's command. This Court determined that the defendant officer was entitled to summary judgment after tasing a non-compliant inmate who had gotten into a physical altercation with an officer and been placed in lockdown. *Id.* at 339. That plaintiff failed to allege that the defendant, who used the Taser but was not involved in the original physical altercation, had any knowledge that the plaintiff was unable to comply with his orders because of a physical impairment. *Id.* Here, in contrast, Plaintiffs provide evidence not just that Mr. Booker was not resisting or failing to obey orders, but also that he was completely restrained, struggling to breathe, and pleading for his life when Defendant Rodriguez tased him. Applt.App. 293-94, ¶¶ 21-22; 296, ¶¶ 31-32; 445-47, ¶¶ 21-22; 448, ¶¶ 31-32; 968, ¶¶ 7-9; 981, ¶¶ 7-9.

Defendants' references to cases from outside of the Tenth Circuit are likewise unhelpful, as each case is easily distinguishable from this one. For example, in *Draper v. Reynolds*, 369 F.3d 1270, 1278 (11th Cir. 2004), the Eleventh Circuit held that a single use of a Taser during a traffic stop of a

belligerent individual who repeatedly refused to obey the defendant's orders was reasonable. Unlike the plaintiff in *Draper*, Mr. Booker was not only subjected to multiple simultaneous uses of force – including a carotid restraint – at the time he was tased, but he was also fully restrained. Applt.App. 968, ¶ 9; 981, ¶ 9.

Likewise, in *Jasper v. Thalacker*, 999, F.2d 353, 354 (8th Cir. 1993), the Eighth Circuit held that a defendant officer's use of a Taser against an inmate who threatened to "'knock' the guard's 'teeth down his throat,'" and then "clenched his fists and lunged toward the guard," did not violate the Eighth Amendment. Far from threatening Defendants' safety, when Defendant Rodriguez decided to tase Mr. Booker for an excruciatingly extended period of time, he was already prone on the ground, with his hands cuffed behind his back, a carotid restraint applied to his neck, OPNs applied to his legs, and all five Defendants on or over his body. Applt.App. 293-94, ¶¶ 21-22; 296, ¶¶ 31-32; 445-47, ¶¶ 21-22; 448, ¶¶ 31-32; 968, ¶¶ 7-9; 981, ¶¶ 7-9. Similarly, the Sixth Circuit, in *Caldwell v. Moore*, 968 F.2d 595, 601 (6th Cir. 1992), held that an inmate who was placed in isolation for fighting with other inmates and "was shouting and kicking for seven hours" in his cell before officers responded with a Taser, was subjected to reasonable force. Mr. Booker's conduct simply did not rise to anything even approaching that level. Finally, in *Michenfelder v. Sumner*, 860 F.2d 328, 335-36 (9th Cir. 1988), the Ninth Circuit was confronted with a claim challenging the jail's general "policy of

allowing its guards to carry taser guns and to use them to enforce compliance with orders," as a violation of the Eighth Amendment. The Ninth Circuit held that the policy was constitutional, *id.*, a holding not at all implicated by the facts of this case.

Because the law prohibiting Defendant Rodriguez's use of the Taser on Mr. Booker under these circumstances was clearly established, Defendant Rodriguez is not entitled to qualified immunity, and the district court's decision must be affirmed.

### 3. Defendants' Duty to Intervene was Clearly Established

Defendants erroneously contend that "the district court erred when it denied qualified immunity on the failure to intervene claim." Appellants' Br. 52. As an initial matter, Plaintiffs do not assert a "failure to intervene claim." Rather, failure to intervene is merely a method to prove that an officer is liable for excessive force. *Mick v. Brewer*, 76 F.3d 1127, 1136 (10th Cir. 1996).[17]

Defendants likewise mistakenly state that a failure to intervene theory may not be asserted pursuant to the Fourteenth Amendment. Appellants' Br. 53. This Court, in recognizing the long-standing rule "that there is an affirmative constitutional duty to stop other officers from using unconstitutionally excessive

---

[17] Plaintiffs pled this theory as part of their excessive force claim from the beginning of this case. Applt.App. 55-56, ¶ 112; 124, ¶ 135.

force," *Casey*, 509 F.3d at 1283, explicitly recognized that this theory applies to both Fourth and Fourteenth Amendment cases. *Id.* at 1283 n.4 ("*Lusby* [*v. T.G. & Y. Stores, Inc.*, 749 F.2d 1423 (10th Cir. 1984), *vacated on other grounds sub nom. City of Lawton v. Lusby*, 474 U.S. 805 (1985)]; *O'Neill* [*v. Krzeminski*, 839 F.2d 9 (2d Cir. 1988)], and *Fundiller* [*v. City of Cooper City*, 777 F.2d 1436 (11th Cir. 1985)] evaluated the use of force as a substantive due process claim; *Mick* was decided under the Fourth Amendment.").

Defendants erroneously contend that Defendants Gomez[18] and Robinette[19] are entitled to qualified immunity because the force they used "was limited to" grabbing Mr. Booker's arm and handcuffing Mr. Booker, Appellants' Br. 44, and that Defendant Sharp is likewise entitled to qualified immunity based solely on his use of OPNs. *Id.* at 43. Defendants misconstrue the law. In fact, each Defendant had an affirmative duty to stop the other Defendants from engaging in excessive

---

[18] Defendant Gomez's articulated fear of a lawsuit resulting from Mr. Booker's death belies any notion that the law prohibiting her conduct was not clearly established. Applt.App. 464, ¶ 15.

[19] Defendant Robinette's decision to place 50-75% of his body weight on Mr. Booker's back while Mr. Booker was in a prone position also violated clearly established law. *Weigel v. Broad*, 544 F.3d 1143, 1155 (10th Cir. 2008) ("[I]t is clearly established that putting substantial or significant pressure on a suspect's back while that suspect is in a face-down prone position after being subdued and/or incapacitated constitutes excessive force." (internal quotation marks omitted)).

force, and all failed to carry out that duty. Moreover, the particular use of force by a law enforcement officer might, standing alone, be reasonable, but could well be excessive when coupled with multiple other simultaneous uses of force by other officers on the same subject.

Defendants' argument misstates the clearly established law of the Tenth Circuit, in which there exists an "affirmative constitutional duty to stop other officers from using unconstitutionally excessive force." *Casey*, 509 F.3d at 1283 (citations omitted). That duty is as follows:

> It is not necessary that a police officer actually participate in the use of excessive force in order to be held liable under section 1983. Rather, an officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force, can be held liable for his nonfeasance.

*Mick*, 76 F.3d at 1136 (internal quotation marks omitted). That duty has been clearly established since at least 1992. *Id.* at 1136. If an officer is "present . . . with an opportunity to prevent the excessive use of force, he [has] a duty to intervene." *Fogarty v. Gallegos*, 523 F.3d 1147, 1163 (10th Cir. 2008).

All of the Defendants arrived on the scene before or as Mr. Booker was taken to the ground. Applt.App. 292, ¶ 15; 441-42, ¶ 15. Not only did Defendants, including Defendants Gomez and Robinette, fail to intervene to stop the use of excessive force, they each joined in – and augmented – the force, while making no

40

effort to even determine what other types of force were being used or to communicate with the other Defendants. *Id.* at 445-47, ¶¶ 22, 28-29; 449-50, ¶ 38; 462, ¶ 7. In addition, Defendant Sharp, instead of stopping the other deputies from using excessive force, added to the force being used by applying his OPNs after Mr. Booker was already being held in a carotid restraint. *Id.* at 447, ¶ 28. Despite his belief that Defendant Grimes was applying a non-departmentally-approved "headlock" to Mr. Booker, Defendant Sharp took no action to stop Defendant Grimes. *Id.* at 444-45, ¶ 20.

Moreover, "[t]he excessive force inquiry includes not only the officers' actions at the moment that the threat was presented, but also may include their actions in the moments leading up to the suspect's threat of force . . . if the conduct is immediately connected to the suspect's threat of force." *Allen v. Muskogee*, 119 F.3d 837, 840 (10th Cir. 1997) (internal quotation marks omitted). This Circuit has applied these principles to hold police officers liable not only for their own use of force, but also for "failing to take some steps to mitigate the fracas that ensued" after it. *Casey*, 509 F.3d at 1285 (asserting that officer who initiated a confrontation had – but did not discharge – a duty "to keep his initial use of force from turning into a melee"). Defendant Gomez, having initiated the confrontation with Mr. Booker, Applt.App. 461-62, ¶ 2; 967, ¶ 2; 979-80, ¶ 2, thus had an even greater duty to prevent the use of excessive force by her fellow officers. In

41

addition, the reasonableness of force depends in part on "whether [the officer's] own reckless or deliberate conduct . . . unreasonably created the need to use such force." *Sevier v. City of Lawrence*, 60 F.3d 695, 699 (10th Cir. 1995). Defendant Gomez's own conduct created the need to use force against Mr. Booker in the first place and must be considered, by an appropriate finder of fact, in the inquiry into whether her conduct was reasonable. Applt.App. 461-62, ¶ 2.

The district court therefore properly denied each Defendant qualified immunity based upon the failure to intervene to stop the other Defendants from using excessive force.

## IV. The District Court Properly Concluded that Defendants are not Entitled to Qualified Immunity on Plaintiffs' Failure to Provide Medical Care Claim

The record fulsomely establishes that genuine issues of material fact preclude a conclusion that Defendants did not violate Mr. Booker's constitutional right to the provision of medical care.[20] Moreover, the law prohibiting

---

[20] While the district court did not make any specific findings of fact or conclusions of law on the record with respect to Plaintiffs' failure to provide medical care claim, the district court was fully advised of the disputed facts and clearly established law prohibiting summary judgment of the claim as explained in Plaintiffs' summary judgment briefing, all contained in the record. This Court may affirm the decision below "on any basis supported by the record." *Seegmiller v. Laverkin City*, 528 F.3d 762, 766 (10th Cir. 2008).

Defendants' conduct was clearly established at the time of Mr. Booker's death, and

the district court properly denied Defendants qualified immunity.

### A. Disputed Facts Preclude a Determination that Defendants Did not Violate Mr. Booker's Right to the Provision of Medical Care

The Supreme Court has long made clear that inmates – including pretrial

detainees – have a constitutional right to medical care:

> An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met. In the worst cases, such a failure may actually produce physical torture or a lingering death, the evils of most immediate concern to the drafters of the [Eighth] Amendment. In less serious cases, denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose. The infliction of such unnecessary suffering is inconsistent with contemporary standards of decency as manifested in modern legislation codifying the commonlaw view that it is but just that the public be required to care for the prisoner, who cannot by reason of the deprivation of his liberty, care for himself.

*Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976) (internal quotation marks and

citations omitted).[21] A jail official violates an inmate's constitutional rights if he

acts with "deliberate indifference to serious medical needs" of an inmate, as such

conduct "constitutes the unnecessary and wanton infliction of pain proscribed by

---

[21] While *Estelle* deals with the Eighth Amendment, it is applicable here because "pretrial detainees are . . . entitled to the degree of protection against denial of medical attention which applies to convicted inmates." *Garcia v. Salt Lake Cnty.*, 768 F.2d 303, 308 (10th Cir. 1985).

the Eighth Amendment," and, "[t]his is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care." *Id*. at 104-05. "The test for constitutional liability of prison officials involves both an objective and a subjective component." *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) (internal quotation marks omitted). At the very least, genuine issues of material fact remain preventing a conclusion that Plaintiffs are unable to meet either portion of this constitutional test. "Where disputed facts implicate either of the two questions of whether a serious medical need existed or whether an officer was deliberately indifferent to it, a court may not grant summary judgment." *Olsen*, 312 F.3d at 1315-16.

## 1. The Objective Component

"The objective component" of the deliberate indifference test "is met if the deprivation is sufficiently serious." *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000). "A medical need is serious if it is one that has been diagnosed by a physician as mandating treatment *or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention*." *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980) (internal quotation marks omitted) (emphasis added).

44

Mr. Booker died as a result of Defendants' use of force on him, and his death was ruled a homicide. Applt.App. 468-69, ¶¶ 29-31. The harm he suffered was, therefore, "without doubt, sufficiently serious to meet the objective component." *Martinez v. Beggs*, 563 F.3d 1082, 1088-89 (10th Cir. 2009).

"An official responds to a known risk in an objectively unreasonable manner if he knew of ways to reduce the harm but knowingly [or] recklessly declined to act." *Howard v. Waide*, 534 F.3d 1227, 1239 (10th Cir. 2008) (internal quotation marks omitted) (alteration in original). In addition, "[i]n determining whether prison officials acted reasonably, [a court] consider[s] what actions they took, if any, as well as available alternatives that might have been known to them." *Id.* at 1240. Here, each Defendant made a deliberate choice to *take no action whatsoever* to evaluate Mr. Booker's medical condition during or after the use of a carotid restraint, a Taser, and other methods of force on him. Applt.App. 451, ¶ 41; 453, ¶ 46; 466, ¶ 21. Considerable evidence establishes that Mr. Booker was literally begging for his life, gasping, "I can't breathe" and "help me." *Id.* at 445-47, ¶ 22. Such failure by Defendants to act is objectively unreasonable:

> [T]hese defendants knew that Plaintiff was in distress but, nevertheless, failed to obtain proper and adequate assistance, *or even make any effort to ascertain Plaintiff's condition*. This alleged inaction is *well beyond the bounds of negligence*; the alleged refusal to assist further delayed Plaintiff's ability to obtain adequate treatment

and purportedly caused Plaintiff to suffer significant pain and discomfort, which did not "serve any penological purpose."

*Mallory v. Jones*, No. 10-cv-02564-CMA-KMT, 2011 U.S. Dist. LEXIS 48378, at *19 (D. Colo. May 3, 2011) (emphases added).

While Defendants' failure to act is, in and of itself, sufficient to establish the objective component of the deliberate indifference test, their failure to act also creates an additional ground for liability in that it delayed the medical treatment that was eventually – albeit belatedly and ineffectually – given to Mr. Booker. Within the context of a failure to provide medical care claim, "[e]ven a brief delay may be unconstitutional." *Mata*, 427 F.3d at 755. Further, "[d]elays that courts have found to violate the Eighth Amendment have frequently involved life-threatening situations and instances in which it is apparent that delay would exacerbate the prisoner's medical problems." *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 1999).

Defendants make much of their one-sided alleged timeline of events. Appellants' Br. 54-55. Plaintiffs, however, dispute Defendants' timeline, Applt.App. 450, ¶ 39; 452, ¶ 43, which creates another issue of disputed fact precluding summary judgment. Further, given Defendants' internally conflicting stories regarding Mr. Booker's actions allegedly demonstrating consciousness and Plaintiffs' factually-supported disagreement with those characterizations, *id.* at

451-53, ¶¶ 42, 44, it cannot be said that undisputed facts establish that Mr. Booker's life could not have been saved by earlier medical intervention. If, as Defendant Gomez contends, Mr. Booker was "healthy" enough in the holding cell to be reaching up behind him and grabbing toward Defendant Rodriguez, *id.* at 452-53, ¶ 44, "there is factual evidence from which a jury could conclude that the delay occasioned by [Defendants'] inaction," *Sealock*, 218 F.3d at 1210, contributed to Mr. Booker's death, and that more expedient provision of medical care could have saved his life. In addition, Defendant Rodriguez extended the delay by choosing to first detour to the sergeants' office to put away the Taser she had deployed on Mr. Booker before continuing to the nurse's station to summon medical attention. Applt.App. 453, ¶ 46.

Genuine issues of material fact prohibit the conclusion that Plaintiffs are unable to establish the objective prong of the deliberate indifference test, and the district court properly denied summary judgment.

## 2. The Subjective Component

"To prevail on the subjective component, the prisoner must show that the defendants knew he faced a substantial risk of harm and disregarded that risk, by failing to take reasonable measures to abate it." *Callahan v. Poppell*, 471 F.3d 1155, 1159 (10th Cir. 2006) (internal quotation marks omitted). "Unlike the objective component, the symptoms displayed by the prisoner are relevant to the

subjective component of deliberate indifference. The question is: were the symptoms such that a prison employee knew the risk to the prisoner and chose (recklessly) to disregard it?" *Martinez*, 563 F.3d at 1089 (internal quotation marks omitted).

The symptoms displayed by Mr. Booker throughout and following the use of force incident are heavily disputed. Applt.App. 445-47, ¶¶ 21-22; 448-49, ¶¶ 32-36; 451-53, ¶¶ 42, 44. Multiple inmates heard Mr. Booker gasp that he could not breathe while Defendant Grimes was applying the carotid restraint, and heard him begging for someone to help him. *Id.* at 445-47, ¶ 22. Various inmates observed that Mr. Booker was not moving or was limp after Defendant Grimes released the carotid restraint. *Id.* at 451, ¶ 41. Some inmates observed that Mr. Booker was "hanging like a dead animal," while he was being carried. *Id.* at 451, ¶ 42. Given the eyewitness observations of Mr. Booker's medical condition during and after the use of force, a reasonable jury could conclude that Defendants were aware of the substantial risk of harm faced by Mr. Booker. *Mata*, 427 F.3d at 752 ("[I]f a risk is obvious, so that a reasonable man would realize it, we might well infer that [the defendant] did in fact realize it." (internal quotation marks and citation omitted)).

Further, Defendants' *deliberate decisions* to take no steps *whatsoever* to determine Mr. Booker's medical condition – including whether he even remained

48

conscious – *at any point* during or after the use of force,[22] Applt.App. 451, ¶ 41;

453, ¶ 46; 466, ¶ 21, demonstrate their blatant disregard of a serious risk of harm.

*Mata*, 427 F.3d at 752 ("An inmate need not show that a prison official acted or

failed to act believing that harm actually would befall an inmate; it is enough that

the official acted or failed to act *despite his knowledge of a substantial risk* of

serious harm." (internal quotation marks omitted).  In fact, each Defendant's

conscious and abject refusal to even look at Mr. Booker's face to determine

whether he was alive, conscious, or in need of medical care, Applt.App. 451, ¶ 41,

strengthens Plaintiffs' claim of deliberate indifference.  *Mata*, 427 F.3d at 752("An

official would not escape liability if the evidence showed that he merely refused to

verify underlying facts that he strongly suspected to be true, or declined to confirm

inferences of risk that he strongly suspected to exist." (internal quotation marks

omitted)).  In this case, even though it is undisputed that Mr. Booker died in the

custody of Defendants, none of them apparently paid enough attention to his

condition as to even utter an explanation as to when he died.

---

[22] Some Defendants' subsequent decision to *eventually* summon medical care for
Mr. Booker does not impact the analysis of their failure to take any steps to
evaluate his medical condition.  *Mata*, 427 F.3d at 756 ("Events occurring
subsequent to [defendant's] complete denial of medical care to [plaintiff] have no
bearing on whether [defendant] was deliberately indifferent *at the time* she refused
to treat [plaintiff].").

Defendants repeatedly contend that they had no idea that Mr. Booker might have been rendered unconscious by their use of force. Appellants' Br. 58-60. Under Supreme Court precedent, however, "[w]hether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer v. Brennan*, 511 U.S. 825, 842 (1994) (internal citation omitted). In this case, a jury could certainly infer, based on direct and circumstantial evidence, that Defendants knew of (and disregarded) a substantial risk of harm to Mr. Booker.

Given the multitude of disputed facts regarding Mr. Booker's condition and Defendants' observations of him, the district court properly denied Defendants qualified immunity. At a minimum, disputed facts remain regarding both whether a risk of serious harm existed, and whether Defendants inferred that it did. *Lopez v. LeMaster*, 172 F.3d 756, 764 (10th Cir. 1999).

**B. The Law Prohibiting Defendants' Conduct was Clearly Established**

Defendants' assertion that Plaintiffs are required to identify "case law finding a due process violation for a 3 minute and 6 second delay in requesting medical assistance," or, "finding a violation for a 4 minute and 58 second delay in the rendering of medical aid," Appellants' Br. 60, is contrary to law. *Hope*, 536

U.S. at 741. At a minimum, the law provided by Plaintiffs passes this Circuit's "sliding scale to determine when a law is clearly established. Under this approach, '[t]he more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation.'" *Fogarty*, 523 F.3d at 1161 (citation omitted).

The law prohibiting Defendants' deliberate decision to ignore signs of Mr. Booker's medical distress – signs observed by multiple inmates looking on, among others, Applt.App. 451, ¶ 41 – and take absolutely no action to determine whether medical care was necessary, *Id.* at 451, ¶ 41; 453 ¶ 46; 466 ¶ 21, was clearly established at the time of Mr. Booker's death. There can be no doubt that Mr. Booker's "right to custodial medical care is clearly established." *Olsen*, 312 F.3d at 1315. It has been clearly established for over a decade that deliberate indifference may be found "when prison officials prevent an inmate from receiving treatment or deny him access to medical personnel capable of evaluating the need for treatment." *Sealock*, 218 F.3d at 1211. Thus, the law prohibiting Defendants from blatantly ignoring obvious signs of Mr. Booker's medical distress was clearly established. The district court therefore properly denied them qualified immunity.

## V. The District Court Properly Concluded that Defendant Rodriguez is Not Entitled to Qualified Immunity on Plaintiffs' Failure to Supervise Claim

Defendant Rodriguez summarily contends that she is entitled to qualified immunity on Plaintiffs' failure to supervise claim because she "remained standing near [Mr.] Booker so she could monitor the situation as it developed, and to give instruction and assistance if needed." Appellants' Br. 42. At a minimum, genuine issues of material fact remain in dispute precluding a conclusion that Defendant Rodriguez did not violate Mr. Booker's constitutional rights, and the law prohibiting her conduct was clearly established at the time of Mr. Booker's death.

### A. Disputed Facts Preclude a Determination that Defendant Rodriguez's Supervisory Conduct was Constitutional

"[S]upervisors are liable for constitutional violations they cause." *Dodds v. Richardson*, 614 F.3d 1185, 1213 (10th Cir. 2010). "A plaintiff may show that an affirmative link exists between the constitutional deprivation and either the supervisor's personal participation, his exercise of control or direction, or his failure to supervise." *Holland v. Harrington*, 268 F.3d 1179, 1187 (10th Cir. 2001).

As thoroughly explained above, disputed issues of material fact remain regarding whether Defendant Rodriguez violated Mr. Booker's constitutional rights through her direct participation in both the use of force (she deployed the

Taser when Mr. Booker was handcuffed and otherwise restrained, after which he stopped moving) and the failure to provide medical care. *See* Sections III(A)(2) and IV(A), *supra*. Further, Plaintiffs can establish that (or, at least, genuine issues of material fact remain regarding whether) Defendant Rodriguez violated Mr. Booker's constitutional rights through her failure to control the situation and her complete failure to supervise the other Defendants.

"A plaintiff may satisfy [the supervisory liability] standard by showing that the defendant-supervisor personally directed the violation or had actual knowledge of the violation and acquiesced in its continuance." *Jenkins v. Wood*, 81 F.3d 988, 995 (10th Cir. 1996); *accord Buck v. City of Albuquerque*, 549 F.3d 1269, 1291 (10th Cir. 2008). Defendant Rodriguez was the supervisory officer on the scene during the use of force against Mr. Booker, directly tying her to the use of force. *Fogarty*, 523 F.3d at 1164 (affirming denial of summary judgment on supervisory liability where plaintiff "sufficiently indicated [supervisor's] 'exercise of control or discretion' over his arrest"). Despite this supervisory responsibility, Defendant Rodriguez took absolutely no actions to monitor the various uses of force. Applt.App. 442-43, ¶ 18. In fact, the only directives Defendant Rodriguez gave to anyone during the entire incident were directed at deputies not involved in the use of force and concerned retrieving leg irons and a Taser, steps designed to *increase* the force that could be inflicted on Mr. Booker. *Id*. Defendant Robinette

characterized Defendant Rodriguez's only "supervisory" action as being present at the scene. *Id*. Use of force expert Martin described Defendant Rodriguez's conduct as "an absolute failure to properly supervise an incident so obviously fraught with risks and danger." *Id*. Despite knowledge of her duty to intervene to stop the use of excessive force, *Id*. at 462, ¶ 4, Defendant Rodriguez, instead of stopping or reducing the infliction of force upon Mr. Booker, added to it by tasing him while he was already restrained and in handcuffs. *Id*. at 448, ¶ 32. *Cf. Jenkins*, 81 F.3d at 995.

Defendant Rodriguez, as the on-scene supervisor, clearly had both the opportunity and the duty to intervene and prevent her subordinate deputies from injuring Mr. Booker. Use of force expert Martin opined that, "[t]he video evidence and Sergeant Rodriguez's deposition testimony reflect that Sergeant Rodriguez had ample opportunities to monitor the officers' actions but chose to remain throughout the incident in a single position at the feet of Mr. Booker." Applt.App. 442-43, ¶ 18. That deliberate choice to take no action to monitor the other Defendants' uses of force renders qualified immunity unavailable to her – and this remains true despite Defendants' contention that the use of force incident lasted mere minutes. *Fogarty*, 523 F.3d at 1164 (affirming denial of qualified immunity for officer who supervised arrest because supervisor who was present during arrest that lasted

"between three and five minutes . . . had the opportunity to prevent [the plaintiff's] injuries").

Because Plaintiffs can establish a constitutional violation via Defendant Rodriguez's personal participation in the use of force and her failure to supervise the other Defendants, the district court properly denied Defendant Rodriguez qualified immunity on Plaintiffs' failure to supervise claim.

## B. The Law Prohibiting Defendant Rodriguez's Supervisory Conduct was Clearly Established

A supervisor's liability for personal participation in the use of excessive force – and also for failing to supervise subordinate officers who commit a constitutional violation– have long been clearly established. *Meade v. Grubbs*, 841 F.2d 1512, 1527 (10th Cir. 1988).[23] Even more specifically, a supervisor's liability for failing to prevent injuries to an inmate when present during a use of force has been clearly established since at least 2008. *Fogarty*, 523 F.3d at 1164.

Because the law prohibiting Defendant Rodriguez's conduct was clearly established at the time of Mr. Booker's death, she is not entitled to qualified immunity, and the district court's denial of summary judgment must be affirmed.

---

[23] The clearly established law prohibiting Defendant Rodriguez's personal participation in the use of force against Mr. Booker is thoroughly explained in Section III(B)(2), *supra*.

## VI.  The District Court Properly Considered Defendants' Actions in Concert

Defendants contend that the district court erred by failing to "conduct any individualized assessment" with respect to each Defendant's assertion of entitlement to qualified immunity.  Appellants' Br. 24.  Defendants provide no legal authority for the proposition that the district court's treatment of Defendants together was improper.  In fact, this Court has consistently considered the actions of Defendants acting together when considering a qualified immunity defense.  The district court relied primarily upon this Court's decision in *Austin*, 945 F.2d 1155, in determining that it did not have to conduct an individualized assessment of each Defendant's conduct:

> I don't recall that the Tenth Circuit [in *Austin*] analyzed allegation by allegation by allegation.  Indeed, as I recall it, they said, any reasonable officer would know that the kind of stuff that the plaintiffs are alleging here is illegal.  They got by that extremely easily.  They said, if what the plaintiffs are saying happened, there isn't any question that a reasonable officer would know better.

Applt.App. 1047.  In fact, in *Austin*, the district court had denied the defendant officers qualified immunity because:

> In their affidavits plaintiffs claim that defendants assaulted them without cause and otherwise subjected them to cruel and inhuman treatment during over twelve hours of detention.  The defendants by their affidavits deny any such conduct.  The dispute in facts between the plaintiffs' version of their treatment during the detention and the defendants' version precludes summary judgment.

> A defense of qualified immunity will not lie at this point in light of the
> type of conduct with which plaintiffs charge defendants.

*Austin*, 945 F.2d at 1157-58 (internal quotation marks omitted). The *Austin* Court

determined that "[t]he district court's treatment of the qualified immunity issue in

connection with plaintiffs' excessive force claim was entirely proper." *Id.* at 1158.

The Court noted that, "[i]t is only by ignoring the particularized allegations of

deplorable violence and humiliation advanced by plaintiffs that defendants are able

to argue for qualified immunity." *Id.* The same is true here.

Since *Austin*, this Court has consistently treated defendants who acted in

concert as a group for purposes of qualified immunity analysis. *See, e.g.*, *Romero

v. Story*, 672 F.3d 880, 888 (10th Cir. 2012) ("[W]e hold *Defendants* lacked

reasonable suspicion." (emphasis added)); *Fogarty*, 523 F.3d at 1162 ("[W]e

conclude that *defendants* cannot avail themselves of qualified immunity at this

stage of the litigation." (emphasis added)); *Cortez*, 478 F.3d at 1131 ("[T]he level

of force the *defendants* used against her was unreasonable in relation to the threat

that she presented and the surrounding circumstances." (emphasis added)). District

Court Judges in Colorado have followed suit. *Smith v. Gilpin Cnty.*, 949 F. Supp.

1498, 1499 (D. Colo. 1996) ("I ruled that violations of clearly established law had

occurred *as to the Defendants as a group*." (emphasis added)).

The district court's treatment of Defendants as a group was entirely proper, and the decision below should be affirmed.[24]

## CONCLUSION

For the foregoing reasons, the district court's decision denying summary judgment should be affirmed in its entirety.

## STATEMENT REGARDING ORAL ARGUMENT

Given the multitude of claims and parties involved in this case, as well as the complexities of the § 1983 claims and the asserted qualified immunity defenses, Plaintiffs believe oral argument would assist the Court in resolving the issues on appeal.

DATED this 18th day of March 2013.

Respectfully submitted,

*s/ Darold W. Killmer*

_____

Darold W. Killmer
Mari Newman
Lauren L. Fontana
KILLMER, LANE & NEWMAN, LLP
1543 Champa Street, Suite 400
Denver, CO 80202
(303) 571-1000

---

[24] Even if the district court were required to conduct an independent assessment of each Defendant's conduct, the record contains such an individualized assessment and supports a conclusion that no Defendant is entitled to qualified immunity. This Court may affirm on that basis. *Seegmiller*, 528 F.3d at 766.

dkillmer@kln-law.com
mnewman@kln-law.com
lfontana@kln-law.com

*Counsel for Plaintiffs-Appellees*

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,926 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Local Rule 32.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2002 in 14-point Times New Roman.

Dated: March 18, 2013

KILLMER, LANE & NEWMAN, LLP

*s/ Darold W. Killmer*
_____
Darold W. Killmer
Mari Newman
Lauren L. Fontana
1543 Champa Street, Suite 400
Denver, CO 80202
(303) 571-1000
dkillmer@kln-law.com
mnewman@kln-law.com
lfontana@kln-law.com

*Counsel for Plaintiffs-Appellees*

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of this **BRIEF OF PLAINTIFFS-APPELLEES** served on March 18, 2013, via CM/ECF to the following:

Thomas S. Rice
Eric M. Ziporin
Senter Goldfarb & Rice, LLC
1700 Broadway, Suite 1700
Denver, CO 80290
(303) 320-0509
trice@sgrllc.com
smckenzie@sgrllc.com
eziporin@sgrllc.com

Joseph Rivera
Office of the City Attorney, Litigation Section
201 W. Colfax Avenue, Dept. 1108
Denver, CO 80202-5332
(720) 913-3100
Joseph.Rivera@denvergov.org

*Attorneys for all Law Enforcement Defendants*

R. Stephen Hall
Bruno, Colin, Jewell & Lowe, PC
1999 Broadway, Suite 3100
Denver, CO 80204
(303) 831-1099
shall@bcjlpc.com

*Attorneys for Defendant Carrie Rodriguez and
Defendant Faun Gomez in their individual capacities*

David C. Colt
Colt Law Firm, PC
501 South Cherry Street, Suite 1060
Denver, CO 80246
(303) 355-1800

davidcolt@coltlawfirm.com

*Attorney for Defendant Kyle Sharp and*
*Kenneth Robinette in their individual capacities*

Jonathan M. Abramson
Kissinger & Fellman, PC
3773 Cherry Creek North Drive, Suite 900
Denver, CO 80209
jonathan@kandf.com

*Attorney for Defendant James Grimes*
*in his individual capacity*

Brent Johnson
Fairfield & Woods P.C.
1700 Lincoln St., Ste. 2400
Denver, CO 80203
(303) 830-2400
bjohnson@fwlaw.com

Scott S. Nixon
Patrick A. Singer
PRYOR JOHNSON CARNEY KARR NIXON, P.C.
5619 DTC Parkway, Suite 1200
Greenwood Village, CO 80111
Phone: (303) 874-3406
snixon@pjckn.com
psinger@pjckn.com

*Attorneys for the Medical Defendants*

KILLMER, LANE & NEWMAN, LLP

*s/ Lauren L. Fontana*

_____

Lauren L. Fontana

# CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that with respect to the foregoing:

(1) all required privacy redactions have been made;

(2) if required to file additional hard copies, that the ECF submission is an exact copy of those documents;

(3) The digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program, AVG Anti-Virus for Windows, Version 2013.0.2904, database version 2641/6185 updated March 17, 2013, and according to the program are free of viruses.

KILLMER, LANE & NEWMAN, LLP

*s/ Lauren L. Fontana*

_____

Lauren L. Fontana